

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00321-CV

———————————————

JERRY DURANT, INDIVIDUALLY AND AS CO-TRUSTEE OF THE DURANT MANAGEMENT TRUST, AND VICKIE D. DURANT, AS CO-TRUSTEE OF THE DURANT MANAGEMENT TRUST, Appellants

V.

TAYLOR SHERIDAN AND BOSQUE RANCH HEADQUARTERS, LLC, Appellees

———————————————

On Appeal from the 415th District Court
Parker County, Texas
Trial Court No. CV22-0414

———————————————

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

This appeal stems from the Durant Management Trust's January 2021 sale of the Silverado[1] ranch to Bosque Ranch Headquarters, LLC.[2] Following that sale, Bosque Ranch's sole member, Taylor Sheridan, learned that the roof of the Silverado's main arena (the Arena) was leaking. Sheridan and Bosque Ranch later sued Jerry Durant (Durant), individually and as co-trustee of the Durant Management Trust, along with Vickie D. Durant (Vickie), as co-trustee of the Durant Management Trust, for breach of contract among other causes of action. Following a five-day jury trial, the jury found that the Durant Management Trust had breached the contract providing for the sale of the Silverado (the Contract) and that the reasonable and necessary costs to replace the Arena's roof were $233,900. After the trial court conducted a bench trial on attorney's fees, it signed a final judgment awarding Bosque Ranch—but not Sheridan—$233,900 in damages and $449,068.75 in attorney's fees against Durant, as co-trustee of the Durant Management Trust, but not in his individual capacity.

---

[1]Following the sale, the Silverado changed names. For ease of reference, we will simply refer to the property as "the Silverado" even when discussing events that took place after the sale.

[2]Sometimes the record refers to "Bosque Ranch Headquarters, LLC," while other times it refers to "Bosque Ranch Headquarters LLC." We will simply refer to the entity as "Bosque Ranch."

In four issues on appeal, Durant, as co-trustee of the Durant Management Trust,[3] argues that (1) the evidence is legally and factually insufficient to support the jury's finding that he breached the Contract; (2) the evidence is legally and factually insufficient to support the jury's finding of $233,900 as the reasonable and necessary costs to replace the Arena's roof; (3) the trial court erred by awarding any amount of attorney's fees; and (4) the evidence does not support the trial court's award of $449,068.75 in attorney's fees. Because the evidence is legally and factually sufficient to support the jury's finding that Durant, as co-trustee of the Durant Management Trust, breached the Contract, we will overrule his first issue. But because the evidence is factually insufficient to support the jury's finding of $233,900 as the reasonable and necessary costs to replace the Arena's roof, we will reverse the trial court's judgment and remand for a new trial on the liability and damages recoverable for the alleged breach of the Contract by Durant, as co-trustee of the Durant Management Trust. Because we are remanding the case for a new trial based on our disposition of Durant's second issue, we need not address his third and fourth issues

---

[3]In the notice of appeal, the appellants were listed as Durant, individually and as co-trustee of the Durant Management Trust, and Vickie, as co-trustee of the Durant Management Trust. The notice of appeal also indicated that the appellees are Sheridan and Bosque Ranch. We styled this appeal accordingly. The appellant's brief filed in this matter, however, listed a single appellant—Durant, as co-trustee of the Durant Management Trust—and a single appellee—Bosque Ranch. Bosque Ranch did not file its own notice of appeal.

concerning the trial court's award of attorney's fees, and we reverse the award of attorney's fees and remand the determination of such fees to the trial court.

## II. BACKGROUND

### A. The Durant Management Trust's Ownership of the Silverado, the Silverado's Arena, and the Employment of Brandon Bearden as the Silverado's Ranch Manager

The Silverado is a ranch that sits on more than six hundred acres in Parker County. Durant testified that he purchased an ownership interest in the Silverado in 1998. While he initially owned only a partial interest in the Silverado, in or around 2006 or 2007, Durant acquired full ownership. Sometime around 2015, the Durant Management Trust was established, and Durant transferred ownership of the Silverado to the Durant Management Trust.

During Durant's and the Durant Management Trust's ownership of the Silverado, the Silverado hosted many horse shows. Those horse shows were held in the Arena, an approximately fifty-five-thousand square foot structure on the Silverado. The Arena included horse stalls, a loping arena, a show pen, judging stands, bleachers, a restaurant, a bar, a dining room, a kitchen, apartments, offices, and bathrooms.

Durant employed Brandon Bearden as the Silverado's ranch manager.[4] Bearden stated that his duties as ranch manager included overseeing horse shows,

---

[4]Bearden estimated that he had been employed as the Silverado's ranch manager for five or six years before the sale to Bosque Ranch. Durant believed that

4

managing persons at the Silverado, and maintaining the Silverado. Bearden acknowledged that, as the Silverado's ranch manager, he was in charge of the Arena's roof. Bearden reported directly to Durant. According to Durant, Bearden was supposed to report anything found wrong at the Silverado to him.

## B. Sheridan's Interest in Purchasing the Silverado, His Communications With Bearden and Durant Regarding the Silverado, and His Tours of the Silverado

Prior to the sale, Sheridan had participated in cutting horse events at the Silverado and was interested in purchasing it. Around September or October 2020, while visiting the Silverado, Sheridan had conversations with Bearden about his interest in it.[5] When Bearden informed Durant of Sheridan's interest in the Silverado, Durant offered to pay Bearden $250,000 if Bearden could get the property sold.[6]

Around October 2020, Sheridan called Timothy Stephen Reich, a real estate broker who had previous dealings with him, regarding his interest in purchasing the Silverado. Reich agreed to represent Sheridan with respect to the prospective purchase.

---

Bearden had been employed as the Silverado's ranch manager for two years before the sale.

[5]Bearden testified that he had approached Sheridan about purchasing the Silverado, stating that he had assumed that Sheridan had a lot of money.

[6]Bearden stated that Durant said that he would pay Bearden $250,000 if Bearden "helped get rid of the ranch."

Around that same time, Sheridan toured the Silverado with Reich and Bearden.[7] Durant asked Bearden if he could accompany them on the tour, but Bearden told Durant that he would slow the group down.[8] According to Durant, he told Bearden to inform Sheridan of any defects to the property that Bearden knew about. During the tour, the group rode around the Silverado's grounds in a vehicle, and they also walked through the Silverado's various buildings, including the Arena. At some point after that initial tour, Sheridan and Reich also toured the Silverado on horseback. Sheridan and Reich testified that they did not see any water damage during their tours of the Arena.

After one of the tours, Sheridan asked Bearden for Durant's phone number, and Bearden gave it to him. According to Sheridan, he and Durant engaged in multiple phone calls and exchanged several text messages regarding Sheridan's interest in purchasing the Silverado.[9] Sheridan stated that during one of those calls, they

---

[7]A horse trainer who was Sheridan's friend also accompanied them on the tour.

[8]Durant stated that he had some health problems at that time and that he "would have slowed them down."

[9]While Durant acknowledged exchanging text messages with Sheridan, he denied having any phone calls with Sheridan. Their text messages, however, seem to indicate that some conversation occurred between them apart from the text messages. In the first text message, Sheridan stated, "Nice to talk Jerry. Look forward to getting this done sir." In the second text message, Sheridan stated, "I am back in town and will have an official offer to you first of the week sir. It will be what we discussed."

6

agreed on a purchase price of $10,000,000.[10]  Sheridan asked Reich to draft a contract

memorializing that agreement.

## C.  The Contract

Reich drafted the Contract, which called for Sheridan's purchase of the

Silverado from the Durant Management Trust for $10,000,000.  The Contract had an

effective date of November 24, 2020.  The earnest money deposit required by the

Contract was $20,000.  The Contract allowed for a sixty-day feasibility period during

which Sheridan could complete any inspection of the Silverado that he desired and

terminate the Contract for any reason.  It further provided that if Sheridan terminated

the Contract during the feasibility period, he would be entitled to the return of the

Contract's earnest money less $1,000.  The Contract allowed Sheridan to extend the

feasibility period for an additional thirty days if he deposited an additional earnest

money deposit of $20,000 prior to the expiration of the initial feasibility period.  The

Contract stated that the sale would close on or before the fifteenth day after the

expiration of the feasibility period.  It also provided, however, that the parties had

agreed to close the sale before December 31, 2020, if Sheridan could.

The Contract stated that Sheridan would accept the Silverado in its "present

condition."  Section 19 of the Contract—a section titled "Material Facts"—contained

certain statements made "to the best of Seller's knowledge and belief."

---

[10]Durant stated that he did not recall that conversation.

7

Section 19(B)(10) of the Contract stated, "Except as otherwise provided in this contract, Seller is not aware of . . . any material physical defects in the improvements on the Property." The Contract also contained a merger clause, stating that it contained the entire agreement of the parties and that the Contract could not be changed except in writing.

## D. The Events During the Contract's Feasibility Period and Durant's Alleged Statement That He Would Fix Any Problems with the Silverado's Buildings

Sheridan instructed Reich to hire inspectors to view the Silverado during the feasibility period. Reich testified that he tried to schedule inspections of the Silverado's structures during the feasibility period, but he stated that he had a difficult time finding available inspectors during that period due to the holidays.

Reich testified about two conversations that he allegedly had with Durant during the feasibility period. Reich stated that in the first conversation, Durant told him that he wanted to close on the Contract before the end of 2020 due to tax reasons. In the second conversation, according to Reich, Durant called him during the feasibility period and told him that if Sheridan would go ahead and close on the purchase of the Silverado, "if there was anything wrong with the buildings . . . [Durant] would make that right." Reich said that Durant told him during that conversation that he "would fix any problem with the building."[11] Reich

_____

[11]On cross-examination, Reich was asked whether Durant had used the word "fix" during the conversation. Reich testified that he "believe[d]" that Durant had

8

stated that Durant also told him that, to Durant's knowledge, "there was nothing wrong with the property."

Reich relayed to Sheridan what Durant had allegedly said during that conversation. Sheridan and Reich both testified that they did not move forward with any more inspections of the Silverado because of Durant's alleged representation that he would fix anything wrong with the Silverado's buildings. Sheridan and Reich did not obtain an inspection of the Arena's roof during the feasibility period.

Durant acknowledged that he had a phone call with Reich during the feasibility period in which Reich indicated that Sheridan would not be able to close on the purchase of the Silverado within the sixty-day feasibility period. Durant maintained, however, that he never told Reich that he would fix anything wrong with the Silverado or make anything right with it.

## E. Sheridan's Assignment of the Contract to Bosque Ranch and the Contract's Closing

On January 6, 2021, Sheridan assigned his interest in the Contract to Bosque Ranch.[12] That same day, the closing on the Contract took place at John Westhoff's

---

used the word "fix," but he could not testify to the exact word used by Durant. Reich maintained, however, that to "fix anything that came up after the closing" was "generally what [Durant had] said."

[12]Sheridan testified that he is the sole owner of Bosque Ranch.

office.[13] Westhoff is an attorney who has represented Durant for approximately forty-five years and who also performs work for a title company. Durant testified that Westhoff represented him in the transaction. Sheridan stated that he believed that Westhoff represented Durant and the Durant Management Trust at the closing and that Westhoff had told him at the closing that he was representing Durant. Westhoff maintained, however, that his role at the closing was on behalf of the title company.

At the closing, Durant and Vickie signed the closing documents as co-trustees of the Durant Management Trust. The Durants then left Westhoff's office, and Sheridan, with Reich in tow, met with Westhoff to sign the closing documents for Bosque Ranch. According to Sheridan, he asked Westhoff whether he should write something on the top of the Contract to indicate that Durant would pay for any issues that came up. Sheridan testified that Westhoff told him that Durant was "as good as his word," that if Durant "said he would do something, he would do it," and that it was unnecessary to place any additional language in the Contract. Sheridan testified that he then signed the closing documents in reliance on Westhoff's statement.[14]

---

[13]Reich explained that Sheridan was unable to close on the Silverado's purchase prior to the end of 2020 because Sheridan was waiting on funds that did not arrive until the start of 2021.

[14]Reich similarly testified that Sheridan had asked Westhoff if he "had anything to be worried about," noting that Durant had said that "he would fix anything that came up that was wrong." According to Reich, Westhoff told Sheridan that Durant was a "man of his word," stating that he had been doing business with Durant for many years and that Durant "would do what he said he would do." Reich initially testified that the conversation between Westhoff and Sheridan had occurred at closing

10

Westhoff admitted, "I may have said that I know [Durant], he's a good man. I may have said that if [Durant] said it, so be it."

## F. Bearden's Conversation with Sheridan Immediately After the Closing Regarding the Arena's Roof Leak

While Sheridan was driving home after signing the closing documents, he received a phone call from Bearden. Bearden asked if the closing had been completed, and when Sheridan indicated that it had, Bearden asked if he could meet Sheridan in person. Shortly thereafter, Sheridan met Bearden at the Arena. During that conversation, Sheridan told Bearden that he wanted to keep him employed as the Silverado's ranch manager.[15]

After his employment situation was confirmed, Bearden told Sheridan that the Arena's roof "had been leaking for years." Bearden showed Sheridan where the leak occurred in the Arena's coffee-bar area. Bearden also told Sheridan about recent bids to fix the leak—one bid from Heath Wallis and another from Clayton Pool—and stated that the work contemplated in the bids had not been done. Bearden indicated

---

before Sheridan signed the closing documents. He later acknowledged, however, that he had said during his deposition that the conversation had occurred after Sheridan had signed the closing documents, and he stated that his deposition testimony would be more accurate than his trial testimony.

[15]Bearden and Sheridan had different recollections about which of them had brought up the issue of Bearden's employment. According to Sheridan, Bearden asked him if he wanted to hire Bearden as the ranch manager, and Sheridan told Bearden that he did. According to Bearden, Sheridan asked him if he wanted to work for Sheridan as the Silverado's ranch manager, and Bearden told Sheridan that he did.

11

that he had not told Sheridan about the leak previously because he had worked for Durant, and Durant had told him to "keep [his] mouth shut." But now that he was working for Sheridan, Bearden "had to notify him that the roof was leaking."

Bearden asked Sheridan not to immediately act on the information, explaining that he was in the process of buying a home from Durant, and he wanted to wait until that home purchase had closed.[16] Sheridan agreed to wait to act on the information until after Bearden had purchased the home from Durant.

## G. Durant's Alleged Prior Knowledge of the Arena's Roof Leak

Bearden testified that the Arena's roof leaked every time it rained. He explained that water from the leak would come into the Arena's coffee-bar area and that a fifty-gallon trash can would be placed in that area to catch the leaking water. Bearden stated that the trash can would be emptied whenever it stopped raining. He estimated that the leak had been occurring for two or three years prior to the Silverado's sale to Bosque Ranch. Bearden testified that during that two-to-three-year period, he spoke with Durant on multiple occasions regarding the leak and inquired as to when Durant would fix the leak.[17]

---

[16]Bearden testified that Durant had agreed to apply the $250,000 due to him for helping sell the Silverado as a reduction in the sales price of the home. Bearden stated that he was concerned that Durant would not honor that agreement if Sheridan brought the leak issue to Durant's attention.

[17]Bearden stated that he could not remember what Durant had told him when he inquired about when the leak should be fixed.

12

Bearden also testified that he had spoken to Durant about the need to tell Sheridan about the leak. According to Bearden, when he told Durant that the leak should be disclosed to Sheridan, Durant told him to "shut [his] mouth." Bearden stated that this conversation had occurred "[w]hen it started getting serious on the deal."[18] Bearden said that he had not mentioned the Arena's roof leak to Sheridan prior to closing because he feared retaliation from Durant.[19]

Bearden also mentioned that "right before" he started talking to Sheridan about purchasing the Silverado, the ceiling in the Arena's kitchen "fell in" due to water damage. Bearden stated that he talked to Durant about the ceiling and had the ceiling fixed.

Durant testified that he did not know about the Arena's roof leak prior to the sale of the Silverado to Bosque Ranch. He stated that Bearden had never told him about the leak and explained that he would have fixed the Arena's roof had he known about the leak. Similarly, Durant testified that he was not aware of any material defects in the Silverado's improvements when he signed the Contract, stating that he would have fixed any material defects if he had been aware of them. While Durant

---

[18]Bearden maintained that this conversation occurred before closing, although he could not say whether it had occurred before or after the Contract was signed, stating, "I don't recollect the time."

[19]Bearden testified that Durant had fired him previously on three different occasions. Durant disagreed with that testimony, stating that Bearden had quit on three previous occasions.

acknowledged that he had visited the Arena numerous times before the Silverado was sold, he testified that he never saw the leak, nor did he see any trash cans placed to catch the dripping water.[20] He also stated that Bearden had not told him that a trash can was being used to collect leaking water. Durant denied telling Bearden to keep his mouth shut regarding the leak.

Durant testified that in 2019 or early 2020, there was a hailstorm at the Silverado, and he had filed an insurance claim with his insurance company for hail damage. That insurance claim was ultimately denied. According to Durant, the insurance company's inspection of the Arena's roof found that "the roof was not defective." Durant mentioned that the inspection report had revealed that the roof "had some material problems" but that there was nothing in the report "that said that [there] was a leak." Melissa Meeker, who worked as Durant's assistant, testified that the insurance company found that the damage from the hailstorm was "all cosmetic and there was no structural damage."

The insurance company's inspection report was admitted into evidence at trial. Durant stated that he had reviewed the report when he received it from the insurance company in its February 7, 2020 letter denying his claim.[21] In the inspection report—which is dated December 17, 2019—the inspector noted that the Arena's roof "was

---

[20]Durant estimated that he was at the Silverado "two to three times a week" in the years before the sale to Bosque Ranch.

[21]The inspection report was enclosed with that letter.

14

not damaged or distressed by the October 20, 2019 storm or other previous storms." The report mentioned, however, that there was "[a]ge-related deterioration of the elastomeric[22] coating [on the Arena's roof,] including cracks and flaking [that] were present throughout the roof areas." The report included photographs of the Arena's roof that contained the inspector's explanations of what was depicted in each photograph. Those statements included, "Deteriorated section of SPF roofing on Main Arena"; "Typical deterioration of elastomeric coating on SPF roofing depicted in previous photograph"; "Closer view of deteriorated elastomeric coating depicted in previous photograph"; and "Closer view of deteriorated elastomeric coating."

In its denial letter, the insurance company stated that the last recorded hail event located at the Silverado had occurred outside the policy period of the insurance contract. The insurance company also noted in its letter that the insurance policy "excludes any damage which is the result of wear and tear." Accordingly, the insurance company denied the hail-damage claim.

## H. The Wallis Bid and the Pool Bid Regarding the Arena's Roof

Due to the Arena's roof leak, Bearden obtained bids from Wallis and Pool prior to closing regarding the Arena's roof (the Wallis Bid and the Pool Bid). Bearden testified that he had Durant's authority to obtain the bids. Durant maintained that he did not instruct Bearden to obtain the bids.

---

[22]As explained by one of the roofers who testified at trial, elastomeric is a rubber coating that is placed on top of the foam on a roof and that keeps water out.

15

Wallis, the owner of Wallis Spray Foam, testified that he prepared the Wallis Bid on September 24, 2020—two months before the parties entered into the Contract. The Wallis Bid contemplated recoating the "backside of [the] [A]rena"—with that work being described as "[p]ressure wash, repair[,] and recoat existing foam roof with [e]lastomeric coating"—and tearing off the old foam and replacing it with one-inch roofing foam and two coats of elastomeric on the "front side of [the] [A]rena and porch cover."[23] Wallis described that contemplated work as "recoat[ing] the roof and tear[ing] off half." The Wallis Bid was for $233,900.

Wallis stated that he emailed his bid to Bearden on December 7, 2020, and that he did not know whether Durant had ever received the bid. Bearden stated that—to the best of his belief—he either emailed or hand delivered the Wallis Bid to Meeker, Durant's assistant.[24] Durant stated that he did not see or receive the Wallis Bid prior to closing, did not know that Wallis was making the bid, and did not authorize Wallis

---

[23]The Wallis bid also included work for recoating a "[s]tall barn," with that work being described as "[p]ressure wash, repair[,] and recoat existing foam roof with [e]lastomeric coating."

[24]Meeker testified that she worked for Durant. She stated that, during the course of that work, she regularly received emails from Bearden. She stated that if she received an email from Bearden that was directed to Durant, it was her normal practice to provide the email to Durant.

to make the bid.[25]  He also said that Meeker did not send him the Wallis Bid.  Wallis was not hired to do the work contemplated by his bid.[26]

Pool, of Clayton T. Pool LLC, prepared and emailed the Pool Bid to Bearden on November 27, 2020—three days after the parties entered into the Contract.  The Pool Bid contemplated repairing deteriorated areas of the Arena's roof and recoating the existing foam roof with elastomeric.  The Pool Bid was for $96,200.  On December 8, 2020, Bearden forwarded the Pool Bid to Meeker.[27]  Meeker testified that she did not remember receiving the December 8, 2020 email from Bearden, although she stated that she had no reason to believe that she had not received it.[28]  Durant testified that he did not get a copy of the Pool Bid from Meeker or otherwise.  Pool was not hired to do the work contemplated by his bid.[29]

---

[25]While Durant stated that he himself did not authorize Wallis to make the bid, he acknowledged that Bearden had authorized Wallis to make the bid.

[26]Durant testified that Wallis had previously recoated the Arena's roof, although he did not know when that work had been done.

[27]A copy of that email was admitted into evidence at trial.  While Bearden maintained that he provided the Wallis Bid and the Pool Bid to Meeker, he admitted that he never presented either of those bids directly to Durant.

[28]Meeker stated that her life was in "[c]omplete chaos" in December 2020, noting that she had given birth to twins earlier in the year and that she had the twins with her in the office during that time.

[29]Durant and Bearden both testified that Pool had performed work on the Arena's roof prior to the sale to Bosque Ranch.  Bearden described the work as "patchwork done on the roof," although he could not say when the work was done.  Durant testified that Pool did "repair work" on the Arena's roof in 1998 and on

17

Sheridan testified that no one had told him about the Arena's roof leak prior to closing nor did anyone mention that the Arena's roof needed to be repaired or replaced. Sheridan also stated that he did not know about the Wallis Bid or the Pool Bid until those bids were brought to his attention by Bearden after closing.

## I. The Continuation of the Arena's Roof Leak After the Sale and Reich's Conversations with Durant Regarding the Leak

After the sale, the Arena's roof continued to leak when it rained, and Bearden continued to place a trash can in the Arena's coffee-bar area to catch the leaking water. Sheridan acknowledged that he could have called someone out to the Silverado to fix the leak, but he stated that he waited to do so because Bearden had asked him to wait until Bearden's home purchase from Durant was finalized.

In September 2021, Bearden completed the purchase of his home from Durant.[30] In November 2021—after Bearden notified Sheridan that he had "gotten his house situation squared away"[31]—Sheridan called Reich to inform him of the Arena's roof leak and to ask him to call Durant regarding the leak. Shortly thereafter, Reich called Durant to inform him of the leak and to tell him that it needed to be

---

several other occasions prior to the sale to Bosque Ranch, although he could not say when the latest work had been done.

[30]The sellers of that property were Durant and Vickie, as trustees of the Durant Management Trust.

[31]As promised, Durant applied the $250,000 that he had agreed to pay Bearden for helping sell the Silverado as a discount to the purchase price of Bearden's home.

taken care of.[32]  According to Reich, Durant told him during that call that the Arena's roof had already been repaired and that there was a warranty on it, mentioning that Wallis and Pool had previously done work on the Arena's roof.

A few weeks later—after Reich had the opportunity to contact Wallis and Pool[33]—Reich called Durant again, telling him that the Arena's roof had not been repaired.  According to Reich, Durant told him during that conversation that he was not going to fix the Arena's roof.  According to Durant, Reich called him "probably a year and a half" after the closing on the Silverado to inform him of the Arena's roof leak.  Durant testified that he told Reich to call Wallis and Pool, mentioning that Wallis and Pool were the individuals who had repaired roofs for him in the past.  Durant stated that Reich did not mention that Sheridan expected him to fix the roof.

## J.  Bosque Ranch's Eventual Repair and Replacement of the Arena's Roof

In or around July 2022, Sheridan asked Mike Barnett of S & B Construction to inspect the Arena's roof.  During his inspection, Barnett noticed that elastomeric was missing from "a big chunk of [the Arena's] roof."[34]  Barnett stated that when elastomeric comes off of a roof and exposes the foam, there is nothing keeping water

---

[32]When asked why he had called Durant, Reich stated, "Because [Durant] told us he would fix anything that's wrong."

[33]Reich testified that he called both Wallis and Pool.  He stated that he was unable to get in contact with Wallis but that he did speak to Pool.

[34]Barnett explained that the Arena's roof was a "one inch urethane foam roof" that had "two layers of elastomeric on top of it."

out of the foam. When that occurs, according to Barnett, the foam "just absorbs the water." Barnett stated that elastomeric is replaced "after about five years," explaining that weather deteriorates elastomeric over time. According to Barnett, the elastomeric on the Arena's roof had "outlived its life."[35]

To stop the leak in the Arena's coffee-bar area, Barnett initially placed "a small patch" on part of the roof. Barnett stated that the patch repair was not a "long-term solution" for the leaking roof but was just meant to "stop[] the water" in the short term. S & B Construction charged and was paid $450 for that repair work.[36] Barnett testified that despite the repair work, the Arena's roof "was in need of replacement" at that time.[37] Barnett opined that the water leak "had been going on for a while," although he could not say for how long it had been occurring.

In September 2022, Barnett submitted a proposal to Sheridan regarding the replacement of the Arena's roof with a "TPO 60-mil vinyl roof." Barnett stated that the replacement roof was "a different roofing system" than the Arena's prior foam

---

[35]Photographs depicting the Arena's roof around the time of Barnett's inspection were admitted into evidence at trial.

[36]The $450 charge to repair the Arena's roof was part of a larger invoice that included other work done by S & B Construction to repair the Arena's interior that had sustained water damage. Ultimately, the jury did not award any damages stemming from the Arena's interior water damage.

[37]Bearden stated that Barnett's repair stopped the leak until the Arena's roof was later replaced. Sheridan similarly acknowledged that he did not see any more water issues between Barnett's repair and the replacement of the Arena's roof.

20

roof. The proposed cost for that work was $346,008. Sheridan agreed to have the work performed, and in approximately January 2023, S & B Construction completed its installation of the new roof. Sheridan testified that Bosque Ranch paid Barnett $346,008 to replace the Arena's roof.

## K. Procedural Background

In April 2022, Sheridan and Bosque Ranch sued Durant, individually and as a co-trustee of the Durant Management Trust, and Vickie, as a co-trustee of the Durant Management Trust. In their live pleading, Sheridan and Bosque Ranch brought claims for breach of contract, common law fraud and fraudulent inducement, statutory fraud, and failure to disclose. Sheridan and Bosque Ranch's measure of damages included "the cost to remediate/replace the defective roof."[38] Durant and Vickie, in their respective capacities, answered, and they brought a third-party claim against Bearden alleging that he had breached his fiduciary duties owed to them. The case proceeded to a five-day jury trial.

At the conclusion of trial, the jury found that Durant, as co-trustee of the Durant Management Trust, had breached the Contract.[39] The jury further found that

---

[38]Sheridan and Bosque Ranch's measure of damages also included "the cost to remediate/repair the substantial water damage caused by the defective roof" and "the cost to remediate/remove the defective [septic system], as well as the cost to design, permit, and install an alternative and compliant on-site sewage facility." The jury, however, did not award any damages for those categories.

[39]Ten of twelve jurors made that finding.

21

the reasonable and necessary costs to replace the Arena's roof were $233,900.[40]  The jury answered "No" to the fraud submissions, and it also found that Bearden had complied with his fiduciary duty owed to Durant.[41]  The trial court later held a bench trial on attorney's fees.  During that hearing, Sheridan and Bosque Ranch's attorneys testified regarding the reasonable and necessary attorney's fees incurred by Sheridan and Bosque Ranch.  One of Sheridan and Bosque Ranch's attorneys testified that the services rendered on the breach of contract claim were "inextricably intertwined" with the services rendered on the tort claims and that services rendered on those claims were "not capable of segregation."[42]

---

[40]Ten of twelve jurors made that finding.

[41]The jury was only asked with whether Bearden had complied with his fiduciary duty owed to Durant individually; it was not asked whether Bearden had complied with any fiduciary duty owed to the Durant Management Trust.  The jury was unanimous in its answers relating to the fraud questions.  Eleven of twelve jurors made the finding that Bearden had complied with his fiduciary duty owed to Durant.

[42]"However, in [*Tony Gullo Motors I, L.P. v. Chapa*], the Texas Supreme Court explained that common or 'intertwined' facts do not make all fees incurred recoverable."  *CA Partners v. Spears*, 274 S.W.3d 51, 81 n.20 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citing *Chapa*, 212 S.W.3d 299, 313–14 (Tex. 2006)).  "Rather, fees are recoverable—and segregation is not required—if the legal work performed 'advances both a recoverable and unrecoverable claim.'"  *Id.* (citing *Chapa*, 212 S.W.3d at 313–14); *see also Chapa*, 212 S.W.3d at 313–14 ("[W]e reaffirm the rule that if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees.  Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated.").

22

Thereafter, the trial court signed a final judgment awarding Bosque Ranch $233,900 in damages and $449,068.75 in attorney's fees against Durant as co-trustee of the Durant Management Trust. The trial court rendered take-nothing judgments in favor of Bearden, Durant individually, and Vickie. The trial court later entered findings of fact and conclusions of law regarding its award of attorney's fees. Durant and Vickie, in their respective capacities, filed a motion to disregard the jury findings, a motion for new trial, and a motion to modify the judgment. Those motions were overruled by operation of law. *See* Tex. R. Civ. P. 329b(c). This appeal followed.

## III. DISCUSSION

### A. Durant's Complaint that the Evidence is Legally and Factually Insufficient to Support the Jury's Finding That He Breached the Contract

In his first issue, Durant argues that the evidence is legally and factually[43] insufficient to support the jury's finding that he, as co-trustee of the Durant Management Trust, breached the Contract. Specifically, he challenges the sufficiency

---

[43]Bosque Ranch argues that Durant has waived his factual-sufficiency complaint regarding his first issue because Durant failed to properly brief it. We disagree. While Durant's argument section pertaining to his first issue seems to be focused more on his legal-sufficiency complaint, he has repeatedly argued that the evidence is factually insufficient, and he has provided us with authorities concerning factual sufficiency. We hold that he has not waived his factual-sufficiency complaint. *See Gill v. Hill*, 688 S.W.3d 863, 869 (Tex. 2024) (stating that "briefing waiver is generally disfavored"); *Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) ("Appellate briefs are to be construed reasonably, yet liberally, so that the right to appellate review is not lost by waiver. Simply stated, appellate courts should reach the merits of an appeal whenever reasonably possible." (citations omitted)); *see also* Tex. R. App. P. 38.1(i).

of the evidence to support the finding that he failed to comply with Section 19(B)(10) of the Contract—the provision concerning his awareness of any material physical defects in the improvements on the property—because there is legally and factually insufficient evidence that he knew or believed on November 24, 2020—the effective date of the Contract—that there was a leak in the Arena's roof.

### 1. Standards of Review

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 640 (Tex. 2023) (citing *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018)). In determining whether legally sufficient evidence supports the challenged finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Id.*; *Cent. Ready Mix Concrete Co., Inc. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

24

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

Both direct and circumstantial evidence may be used to establish any material fact. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004); *Grisel v. Everest Int'l, LLC*, No. 02-19-00401-CV, 2022 WL 714516, at *14 (Tex. App.—Fort Worth Mar. 10, 2022, pet. denied) (mem. op.). A fact is established by circumstantial evidence when it can be fairly and reasonably inferred from other facts proved in the case. *Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex. 1995); *Grisel*, 2022 WL 714516, at *14. But to withstand a legal-sufficiency challenge, circumstantial evidence still must consist of more than a scintilla. *Blount*, 910 S.W.2d at 933; *Grisel*, 2022 WL 714516, at *14. Circumstantial evidence can establish actual knowledge, but such evidence must either directly or by reasonable inference support that conclusion. *Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015); *Primoris Energy Servs. Corp. v. Myers*, 569 S.W.3d 745, 757 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (op. on reh'g). "When the

25

circumstances are equally consistent with either of two facts, neither fact may be inferred." *City of Keller*, 168 S.W.3d at 813.

### 2. Analysis

Durant's first issue concerns the sufficiency of the evidence that he breached Section 19(B)(10) of the Contract.[44]  That provision states, "Except as otherwise provided in this contract, Seller is not aware of . . . any material physical defects in the improvements on the Property."  According to Durant, there is no or insufficient evidence that he knew that the Arena's roof leaked when he signed the Contract. Bosque Ranch, however, argues that "[t]here is substantial direct and circumstantial evidence before and after the Contract was signed from which the jury could find that Durant knew of the [Arena's roof leak] when he signed the Contract."  We agree with Bosque Ranch.

First, we note the evidence from Bearden.  Bearden stated that the Arena's roof had been leaking every time it rained in the two to three years before the sale to Bosque Ranch, necessitating a fifty-gallon trash can's being placed in the Arena's coffee-bar area to catch the leaking water.  Notably, Bearden testified that he informed Durant of the Arena's roof leak on multiple occasions during that two-to-

---

[44]To establish a breach of contract, a plaintiff must prove that (1) a valid contract exists, (2) the plaintiff performed or tendered performance as contractually required, (3) the defendant breached the contract by failing to perform or tender performance as contractually required, and (4) the plaintiff sustained damages due to the breach. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019).

26

three-year period and inquired as to when Durant would fix the leak. That is direct evidence of Durant's knowledge of the Arena's leaking roof. *See Arredondo v. Vill. on the Lake, LTD*, 681 S.W.3d 853, 862 n.3 (Tex. App.—Houston [14th Dist.] 2023, no pet.) (stating that direct evidence is evidence which, if believed, would prove the existence of a fact without any inferences or presumptions).

While Durant maintained that he never saw the leak or the trash cans placed to catch the dripping water, the jury could have disbelieved that testimony, as Durant also stated that he was at the Silverado "two to three times a week" in the years before the sale to Bosque Ranch. And while Durant referenced past work by Wallis and Pool to repair the Arena's roof, Durant was unable to say when that work had occurred or whether it had occurred during the two-to-three-year period referenced by Bearden. In his brief, Durant mentions that "[t]o the extent [he] may have known of a past [A]rena leak . . . the leak was 'fixed' and 'repaired.'" But the evidence Durant points to in support of that proposition is Bearden's testimony that "right before" Bearden started talking to Sheridan about purchasing the Silverado, the ceiling in the Arena's kitchen "fell in" due to water damage, Bearden talked to Durant about the ceiling, and Bearden had the ceiling fixed. We fail to see how repairing a damaged ceiling—the effect of water damage—somehow equates to also repairing a damaged roof. If anything, the jury could have reasonably believed that Durant's knowledge of the ceiling's falling in due to water damage should have alerted him to a potential roof leak.

27

Bearden also testified that he had talked to Durant about the need to tell Sheridan about the leak and that Durant had told him to "shut [his] mouth." Bearden stated that this conversation had occurred "[w]hen it started getting serious on the deal." While Bearden was unable to say whether this conversation occurred before or after the Contract was signed, he made it clear that it had occurred before closing. The jury could have fairly and reasonably inferred, given all the other evidence, that the conversation had occurred before Durant signed the Contract.[45] *See Blount*, 910 S.W.2d at 933; *Grisel*, 2022 WL 714516, at *14.

We next turn to the evidence from the insurance report. Durant testified that he received and reviewed an inspection report sent to him by his insurance company on February 7, 2020, following his submission of an insurance claim after a hailstorm. In that report, the inspector noted that the Arena's roof had "[a]ge-related deterioration of the elastomeric coating" and that this deterioration included "cracks and flaking [that] were present throughout the roof areas." The report included photographs of the Arena's roof, with explanations from the inspector stating, among other things, "Deteriorated section of SPF roofing on Main Arena"; "Typical deterioration of elastomeric coating on SPF roofing depicted in previous

---

[45]Bearden used similar language to describe an event that happened before the Contract was signed. To that end, Bearden stated that Sheridan had asked for Durant's phone number when Sheridan "started getting serious" about his interest in the Silverado.

28

photograph"; "Closer view of deteriorated elastomeric coating depicted in previous photograph"; and "Closer view of deteriorated elastomeric coating."

While Durant maintains in his brief that his insurance claim "was denied because any damage was only 'cosmetic,' not 'structural,'" the letter from the insurance company tells a different story. The letter stated that the last recorded hail event near the Silverado had occurred outside the policy period of the insurance contract. The insurance company also noted that the insurance policy "excludes any damage which is the result of wear and tear." Accordingly, the insurance company denied the claim. While Durant testified that the inspection report found that the Arena's roof was "not defective," he also stated that the report had revealed that the roof "had some material problems." When coupled with Barnett's testimony—that the Arena's water leak "had been going on for a while"—the inspection report provides evidence from which a jury could fairly and reasonably conclude that Durant knew about the Arena's roof problems at the time he signed the Contract. *See Blount*, 910 S.W.2d at 933; *Grisel*, 2022 WL 714516, at *14.

We next turn to the Wallis Bid and the Pool Bid. We note that the Wallis Bid was prepared on September 24, 2020—two months before the parties entered into the Contract—and that the Pool Bid was prepared on November 27, 2020—three days after the parties entered into the Contract. While Durant testified that he did not instruct Bearden to obtain the bids, Bearden testified that he had Durant's authority to obtain the bids. The evidence also reflected that Bearden reported directly to

29

Durant and that Bearden was supposed to report anything he found wrong at the Silverado to Durant.

Viewing the evidence in the light most favorable to the jury's finding and indulging every reasonable inference deducible from the evidence in support of that finding, we hold that the jury could have reasonably formed a firm conviction or belief that Durant knew about the Arena's roof leak when he signed the Contract and that he thus breached the Contract. *See United Rentals N. Am., Inc.*, 668 S.W.3d at 640; *Gunn*, 554 S.W.3d at 658. Based on our exacting review of the entire record and giving due deference to the jury's findings, we likewise conclude that the evidence is factually sufficient to support the jury's finding that Durant breached the Contract. *See Crosstex N. Tex. Pipeline, L.P.*, 505 S.W.3d at 615; *Pool*, 715 S.W.2d at 635.

We overrule Durant's first issue.

## B. Durant's Complaint That the Evidence is Legally and Factually Insufficient to Support the Jury's Finding of $233,900 as the Reasonable and Necessary Costs to Replace the Arena's Roof

In his second issue, Durant argues that the evidence is legally and factually[46] insufficient to support the jury's finding of $233,900 as the reasonable and necessary

---

[46]Just as it did with Durant's first issue, Bosque Ranch argues that Durant has waived his factual-sufficiency complaint regarding his second issue because Durant failed to properly brief it. Once again, we disagree. While Durant's argument section pertaining to his second issue seems to be focused more on his legal-sufficiency complaint, he has argued that the evidence is factually insufficient, and he has provided us with authorities concerning factual sufficiency. We hold that he has not waived his factual-sufficiency complaint. *See Gill*, 688 S.W.3d at 869; *Perry*, 272 S.W.3d at 587; *see also* Tex. R. App. P. 38.1(i).

cost to *replace* the Arena's roof in 2024 because that is the same amount of the Wallis Bid in 2020 to *repair* the roof, and there is no evidence that this amount is reasonable and necessary.

## 1. Standards of Review

We apply the same standards of review discussed in our disposition of Durant's first issue—legal and factual sufficiency—with respect to his second issue. Because we will ultimately reverse Durant's second issue based on factual sufficiency, we also note that when reversing for factual sufficiency, we must detail the evidence relevant to the issue in consideration and clearly state why the finding is factually insufficient—that is, why the evidence supporting the finding is so weak or is so against the great weight and preponderance of the evidence that the finding is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Crosstex N. Tex. Pipeline, L.P.*, 505 S.W.3d at 615; *Pool*, 715 S.W.2d at 635.

## 2. Applicable Law

Under Texas law, "whether to award damages and how much is uniquely within the fact[]finder's discretion." *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003). Indeed, a jury has broad discretion to award damages within the range of evidence presented at trial. *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723 (Tex. App.—Houston [14th Dist.] 2017, no pet.). "There is no requirement that the evidence show precisely how the jury arrived at the specific amount awarded." *Id.* When trial evidence supports a range of damages, an award

31

within that range is an appropriate exercise of the jury's discretion, and we may not speculate on how the jury actually arrived at its award. *Id.* at 723–24. "Nonetheless, a jury must have an evidentiary basis for its findings." *Id.* at 724.

A plaintiff seeking to recover remedial damages—like the damages sought here[47]—must prove that the damages sought are reasonable and necessary. *McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012); *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200 (Tex. 2004). To establish that the damages sought are reasonable and necessary, a plaintiff "must show more than simply 'the nature of the injuries, the character of and need for the services rendered, and the amounts charged therefor.'" *McGinty*, 372 S.W.3d at 627 (quoting *Dall. Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377, 383 (Tex. 1956)). "Instead, some other 'evidence showing that the charges are reasonable' is required." *Id.* (quoting *Dall. Ry. & Terminal Co.*, 294 S.W.2d at 383). Out-of-pocket expenses alone do not establish that damages are reasonable and necessary. *Id.* at 627–28; *Mustang Pipeline Co.*, 134 S.W.3d at 201. "The magic

---

[47]We make no holding with respect to whether the proper measure of damages was submitted to the jury. No party objected to the measure of damages included in the jury charge, and thus, we are free to review the sufficiency of the evidence in light of the measure of damages that was submitted. *See Wash. Mut. Bank v. Hous. Windcrest W. Rd. I, L.P.*, 262 S.W.3d 856, 859 (Tex. App.—Dallas 2008, pet. denied) ("In addition, even if the jury was instructed to apply an incorrect measure of damages, absent objection to the charge, we may review the sufficiency of the evidence in light of the charge given."); *see also Guerra v. Brumlow*, 630 S.W.2d 425, 429 (Tex. App.—San Antonio 1982, no writ) ("Unless a party objects to a charge on the grounds that it submits an improper measure of damage, he waives the objection and cannot complain on appeal that the charge permitted the jury to find damages based on the wrong measure.").

words 'reasonable' and 'necessary' need not be used as long as there is sufficient evidence for the trier of fact to conclude that the [remedial work is] necessary and the cost is reasonable." *Wortham Bros., Inc. v. Haffner*, 347 S.W.3d 356, 360 (Tex. App.— Eastland 2011, no pet.).

### 3. Analysis

In his brief, Durant argues that "there is no evidence that the 'reasonable and necessary cost to replace the roof over the [Arena]' was $233,900." Durant points out that the amount awarded by the jury was the exact amount of the Wallis Bid.

Bosque Ranch counters that the Wallis Bid and Wallis's testimony are evidence of the reasonableness and necessity of the damages award. But Wallis's testimony was limited to his discussion of his involvement in the spray-foam roofing business, his past work for Durant, and the fact that he prepared the Wallis Bid and submitted it to Bearden. There was nothing contained in his testimony that touched upon the reasonableness of the cost of his bid, let alone the necessity of having the Arena's roof replaced. Moreover, Wallis's Bid specifically talked about "repair" of the Arena's roof, and Wallis described the contemplated work as "recoat[ing] the roof and tear[ing] off half." The jury was not asked to award damages based on the cost to *repair* the Arena's roof; the jury was asked to award damages based on the cost to *replace* the Arena's roof.[48] *See Tex. Windstorm Ins. Ass'n v. Com. Off. Park-One, L.P.*,

---

[48]Bosque Ranch's argument that a March 2022 bid from a different roofing company—Advanced Roofing & Insulation—for $242,209.38 to *repair* the Arena's

33

No. 13-20-00425-CV, 2024 WL 4378729, at \*14 (Tex. App.—Corpus Christi–Edinburg Oct. 3, 2024, no pet.) (mem. op.) ("We may only measure the sufficiency of the evidence as it relates to the question submitted, which in this case asked the jury to determine the amount it would cost to *replace* the roofs."); *see also Bradley v. Castro*, 591 S.W.2d 304, 306 (Tex. App.—Fort Worth 1979, no writ) ("[W]e distinguish the cost of repair of the existing engine from the cost of replacement with another used engine for the purpose of establishing reasonableness of cost of repair.").

Bosque Ranch argues that "[g]iven [Wallis's] longevity in the roofing business, the jury could reasonably find that Wallis'[s] job estimates reflect reasonable (not inflated) and necessary costs." Texas law demands more. As noted above, a plaintiff must show more than simply the nature of the injuries, the character of and need for the services rendered, and the amounts charged. *McGinty*, 372 S.W.3d at 627; *Dall. Ry. & Terminal Co.*, 294 S.W.2d at 383; *see Bradley*, 591 S.W.2d at 306 ("Mere proof of amounts charged or paid does not raise an issue of reasonableness and such amounts ordinarily cannot be recovered without evidence showing that the charges are reasonable.").

Bosque Ranch also argues that Barnett's testimony and S & B Construction's ultimate replacement of the roof after the sale provide sufficient evidence to support the jury's damages award. While we acknowledge that Barnett did provide testimony

_____

roof likewise does not provide evidence of the reasonableness and necessity of the costs to *replace* the roof.

regarding the need for the Arena's roof to be replaced, he did not provide any evidence regarding the reasonableness of the $346,008 that Bosque Ranch paid for the roof replacement. To that end, the testimony regarding the reasonableness of that amount consists of S & B Construction's invoice and Sheridan's testimony that Bosque Ranch paid the invoice. Such evidence of out-of-pocket expenses do not establish that damages are reasonable and necessary. *McGinty*, 372 S.W.3d at 627–28; *Mustang Pipeline Co.*, 134 S.W.3d at 201.

Finally, Bosque Ranch argues that the Pool Bid is evidence of the reasonableness and necessity of the jury's damages award. But the Pool Bid specifically contemplated work for "Roof Repairs," and there was no testimony presented that the costs of the Pool Bid were reasonable.[49]

Bosque Ranch points to two cases—*Hernandez v. Lautensack*, 201 S.W.3d 771 (Tex. App.—Fort Worth 2006, pet. denied) and *Del Bosque v. Barbosa*, No. 05-22-00230-CV, 2023 WL 1097556 (Tex. App.—Dallas Jan. 30, 2023, no pet.) (mem. op.)—to support its argument that there is sufficient evidence to support the jury's damages award.

In *Lautensack*, a homeowner—Lautensack—hired a roofer—Hernandez—to replace a slate tile roof at his residence. 201 S.W.3d at 774. The roof installed by Hernandez had numerous leaks that Hernandez was unable to fix. *Id.* Hernandez

_____

[49]Indeed, Pool did not testify at trial.

35

offered to replace the roof for $9,100 in labor charges if Lautensack would also provide new slate tiles at a cost of $25,000. *Id.* Displeased with Hernandez's past work, Lautensack hired a different roofer—Petty—to install a cement tile roof for $32,330. *Id.* Lautensack later sued Hernandez, alleging breach of contract among other claims. *Id.* at 775. At trial, the jury returned a verdict in Lautensack's favor, awarding him $24,750 in actual damages. *Id.*

On appeal, Hernandez argued that there was no evidence that the amount awarded by the jury was reasonable. *Id.* at 776. We disagreed. *Id.* at 777. We noted that Perry had testified that Hernandez had improperly installed the roof, that Perry had bid $32,330 to replace the roof, and that Perry's invoice reflected that Lautensack had paid that amount. *Id.* We further said that "[o]ther evidence showed that . . . Hernandez charged $20,000 for the roof he installed on Lautensack's house and that Hernandez offered to replace his first roof for $9,100 plus $25,000 in slate to be provided by Lautensack." *Id.* We also stated that Hernandez had "himself offered the estimate of another roofer to replace just 419 out of the 14,000 to 15,000 slate tiles on Lautensack's roof for $22,015." *Id.* Based on that evidence, we concluded that there was some evidence to support the jury's award of $24,750 in actual damages. *Id.*

We find *Lautensack* distinguishable. We note that *Lautensack*—a case decided pre-*McGinty*—only involved a complaint of legal insufficiency, not a complaint of both legal and factual insufficiency. *See id.* at 776. Further, in *Lautensack*, there was

36

evidence from the defendant himself, Hernandez, regarding the amount that he would charge to replace the roof. *Id.* at 774. Here, however, there is obviously no similar evidence from Durant regarding the amount he would charge to replace the Arena's roof. *See GHP Nail Sys., LLC v. Benelux Cosms. B.V.*, 651 S.W.3d 574, 585 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (distinguishing *Lautensack* for similar reasons).

In *Del Bosque*, Barbosa and Del Bosque entered into an oral contract to build and operate a restaurant on property owned by Barbosa. 2023 WL 1097556, at *1. Del Bosque, who had significant construction experience, agreed to pay the first $150,000 of the construction costs, with the parties to share the remaining costs equally. *Id.* Del Bosque later advanced all of the costs to complete the project because Barbosa was incarcerated, and when Del Bosque sought reimbursement, Barbosa denied that the parties had a contract. *Id.* Del Bosque filed suit alleging, among other things, breach of contract. *Id.* The jury found that Barbosa had breached the contract and that Del Bosque had suffered damages in the amount of $117,182.97. *Id.* The trial court granted Barbosa's motion for judgment notwithstanding the verdict (JNOV). *Id.*

On appeal, Del Bosque argued that "the trial court erred in granting the JNOV because the evidence was legally sufficient to establish that the construction costs he incurred were reasonable and necessary." *Id.* On appeal, the court of appeals noted that Del Bosque had extensive construction experience, that he had personally

37

inspected the premises and evaluated the state of construction, that he had agreed to be responsible for the first $150,000 in expenses, that the parties were to split the remaining costs, and that "375 pages of detailed, dated invoices [were] introduced into evidence" to detail Del Bosque's expenditures. *Id.* at *2–3. The appellate court stated that the jury could reasonably have drawn an inference that Del Bosque had no incentive to inflate costs because of the parties' agreement that he would be responsible for half of the costs after his initial $150,000 outlay. *Id.* at *3. Based on all of that evidence, and despite "no witness explicitly testif[ying] that the expenses incurred were reasonable and necessary," the court of appeals held that "the evidence was sufficient for a reasonable and fair-minded jury to rationally conclude that Del Bosque was entitled to recover $117,182.97 for expenses reasonably and necessarily incurred to construct the restaurant." *Id.* at *4. Accordingly, the court of appeals held that the trial court had erred by granting the JNOV. *Id.*

We find *Del Bosque* distinguishable. We note that *Del Bosque*—like *Lautensack* and unlike the circumstances here—only involved a complaint of legal sufficiency. We further note that in *Del Bosque*, the plaintiff was responsible for the first $150,000 of construction costs and was splitting the remaining construction costs, allowing the jury to reasonably draw an inference that the plaintiff would not inflate his costs. *Id.* at *3. No similar evidence exists here. Moreover, in *Del Bosque*, the evidence consisted of "375 pages of detailed, dated invoices." *Id.* at *2–3. The record here does not provide such voluminous and detailed invoices.

38

Based on our review of the evidence, and applying the applicable standards of review detailed above, we hold that while the record contains some evidence to support an award of damages—namely, the evidence that the Arena's roof leaked due to missing and deteriorated elastomeric and the roof ultimately being repaired and replaced to fix the leak—there is factually insufficient evidence to support the amount awarded by the jury, $233,900. *See Aguilar v. Aguilar*, No. 04-24-00161-CV, 2025 WL 1512197, at *6 (Tex. App.—San Antonio May 28, 2025, no pet.) (mem. op.) ("[W]hile the record arguably contains legally sufficient evidence to support a finding of liability and at least some amount of damages in [the appellee's] favor, the evidence is factually insufficient to support the full amount of the money judgment the trial court awarded to [the appellee]."); *Hernandez v. Sovereign Cherokee Nation Tejas*, 343 S.W.3d 162, 173 (Tex. App.—Dallas 2011, pet. denied) ("We conclude that the evidence is legally sufficient to support an award of damages, but we agree with Hernandez that the evidence is factually insufficient to support the amount of the award."); *Sw. Bell Tel. Co. v. Hamil*, 116 S.W.3d 798, 801 (Tex. App.—Fort Worth 2003, no pet.) (holding that while there was some evidence in the record to support the jury's award of damages, the evidence was factually insufficient to support the amount awarded). To that end, while the record contained ample evidence suggesting that the Arena's roof was leaking at the time the Contract was entered, and while Barnett testified that the leak "had been going on for a while" and that the Arena's roof "was in need of

39

replacement," there was insufficient evidence to support the reasonableness and necessity of the amount awarded—$233,900.[50]

When liability is contested, an appellate court may not grant a new trial on unliquidated damages only. Tex. R. App. P. 44.1(b); *Pointe W. Ctr., LLC*, 476 S.W.3d at 150. In this case, Durant disputes both liability and the amount of damages. Therefore, we must remand for a new trial on the liability and damages recoverable for the alleged breach of the Contract by Durant, as co-trustee of the Durant Management Trust. *See Pointe W. Ctr., LLC*, 476 S.W.3d at 150; *see also Piwko v. Acevedo*, No. 05-23-00135-CV, 2024 WL 3198891, at *9 (Tex. App.—Dallas June 27, 2024, no pet.) (mem. op.) ("Because liability is contested in this case, we cannot order a new trial solely on the issue of unliquidated damages. Accordingly, here, we will remand this case for a new trial on liability and damages." (citation omitted)).

---

[50]While we couch our holding in terms of factual insufficiency, if we couched it in terms of legal insufficiency, the result would be the same—a remand to the trial court for a new trial. *See Pointe W. Ctr., LLC v. It's Alive, Inc.*, 476 S.W.3d 141, 150 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (stating that while appellate courts ordinarily render judgment when sustaining a no-evidence issue, when there is evidence to support some damages, it is inappropriate to render judgment); *CCC Grp., Inc. v. S. Cent. Cement, Ltd.*, 450 S.W.3d 191, 202–03 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (sustaining no-evidence point regarding future repair damages but reversing and remanding for new trial); *Bradley*, 591 S.W.2d at 307 ("Having decided there is no evidence of the reasonableness of damages, we reverse the judgment of the trial court. We remand the case to the trial court for a new trial."); *see also Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 51 (Tex. 1998) ("[B]ecause there is no legally sufficient evidence to support the entire amount of damages, but there is some evidence of the correct measure of damages, we reverse the judgment of the court of appeals and remand the cause for a new trial.").

We sustain Durant's second issue.[51]

## IV. CONCLUSION

Having overruled Durant's first issue, having sustained his second issue, and needing not address his third and fourth issues, we reverse the trial court's judgment and remand for a new trial on the liability and damages recoverable for the alleged breach of the Contract by Durant, as co-trustee of the Durant Management Trust. We also reverse the trial court's award of attorney's fees and remand the determination of such fees to the trial court. We affirm the remaining portions of the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: July 24, 2025

---

[51]Because we are remanding for a new trial, we must also reverse the trial court's award of attorney's fees and remand the determination of such fees to the trial court. *See Pointe W. Ctr., LLC*, 476 S.W.3d at 153 ("We reverse the trial court's award of damages for breach of contract based on reasonable cost of repair and remand that issue for a new trial on liability and damages. Because we have reversed this issue, we must also remand the matter of attorneys' fees for a new trial."); *Velasquez v. Ramirez*, No. 04-13-00319-CV, 2014 WL 5175716, at *8 (Tex. App.—San Antonio Oct. 15, 2014, no pet.) (mem. op.) (reversing portion of judgment relating to fraud claim and award of attorney's fees and remanding for a new trial on those issues after determining that "the evidence supporting the amount of damages found by the jury [on the fraud claim] was legally insufficient"). Accordingly, we need not address Durant's third and fourth issues. *See* Tex. R. App. P. 47.1.